UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

REGINALD CAMERON, JR.                    :

                  Plaintiff,      :      **COMPLAINT**

          - against -              :      No. 24-cv-4519

THE CITY OF NEW YORK, CARLOS             :
GONZALEZ, MARYANN HERBERT,                      Jury Trial Demanded
EDWARD GARDNAR, THOMAS WRAY,             :
ESTATE OF VINCENT GRECO, RUBEN
MARTINEZ, MAUREEN KEMPTON,               :
JOSEPH CROCE, MICHAEL DEMPSEY,
GLENN BOVE, and JOHN/JANE DOE Nos.       :
1 through 10 (whose identifies are currently
unknown but who are known to have been           :
police officers and/or supervisors with the
New York City Police Department) in their        :
individual and official capacities,
                             :
                Defendants.
------------------------------------------------------------x

     Plaintiff, REGINALD CAMERON, JR., by his attorneys, the LAW OFFICES OF

JOEL B. RUDIN, P.C., respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

     1.    This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, New York

State law, and New York City Administrative Code § 8-803, seeking monetary damages

for Plaintiff Reginald Cameron, Jr., under federal and state law, stemming from his

wrongful conviction for a crime he did not commit.

     2.    Mr. Cameron was deprived of his liberty because the defendant police

officers manufactured a case against him by coercing two teenagers, as well as Mr.

Cameron himself, to falsely implicate Mr. Cameron in a series of statements which conflicted with the objective facts and which they knew or should have known were false. The individually named defendants (the "Individual Defendants") are personally liable for this misconduct.

3.    Their tactics—to "close" homicide cases with coerced statements resulting from improper interrogation techniques—occurred with impunity in the 1980s and 1990s in New York City, leading to numerous wrongful convictions.

4.    The toleration of such police misconduct by City policymaking officials encouraged its repetition and led directly to the miscarriage of justice that occurred in this case, thus subjecting the Defendant City to liability under federal civil rights principles.

## JURISDICTION AND VENUE

5.    This action arises under 42 U.S.C. §§ 1983 and 1988, and the common law of the State of New York.

6.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and under the principles of pendent jurisdiction.

7.    Venue is proper under 28 U.S.C. § 1391.

8.    This action has been commenced within the applicable period for each claim.

9.    On November 1, 2023, Mr. Cameron served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law. § 50–e.

## THE PARTIES

10.     Plaintiff REGINALD CAMERON, JR., is a citizen and resident of the State of New York and the United States. He resides within the Eastern District of New York.

11.     Defendant CITY OF NEW YORK ("City") is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

12.     Defendant CARLOS GONZALEZ, Shield No. 1518, was at all relevant times a detective employed by the New York City Police Department ("NYPD"), acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

13.     Defendant MARYANN HERBERT, Shield No. 1878, was at all relevant times a detective employed by the NYPD, acting within the scope of her authority and under color of state law. She is named here in her individual and official capacities.

14.     Defendant EDWARD GARDNAR was at all relevant times a sergeant employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

15.     Defendant THOMAS WRAY, Shield No. 3951, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

16.     Defendant VINCENT GRECO, Tax Reg. No. 868111, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

3

17.     Defendant RUBEN MARTINEZ was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

18.     Defendant MAUREEN KEMPTON, Tax Reg. No. 866861, was at all relevant times a detective employed by the NYPD, acting within the scope of her authority and under color of state law. She is named here in her individual and official capacities.

19.     Defendant JOSEPH CROCE, Shield No. 1021, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

20.     Defendant MICHAEL DEMPSEY, Shield No. 877530, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

21.     Defendant GLENN BOVE was at all relevant times a police officer employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

22.     Defendants JOHN DOE Nos. 1 through 10 were at all relevant times officers and/or supervisors employed by the NYPD, acting within the scope of their authority and under color of state law. They are named here in their individual and official capacities.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### I.    The Homicide of Kei Sunada and Initial Errors in the Police Paperwork

23.    On August 4, 1994, Kei Sunada was shot in the Colombia building of the Lefrak City housing complex.

24.    The Colombia building is located at 97-15 Horace Harding Expressway in Corona, Queens, New York.

25.    A special patrolman employed by Lefrak City, Patrick Codling, found Sunada lying on the landing of the fourth-floor stairwell in the Colombia building, where he had been shot.

26.    An open, blue knapsack, containing items belonging to Sunada, was found by his body.

27.    It was never vouchered and apparently lost.

28.    Defendant Gonzalez, a detective assigned to the NYPD's 110th Precinct, was assigned the case.

29.    Gonzalez responded to the scene where Sunada was found.

30.    Gonzalez stated in two DD–5 reports that Sunada was found in the fourth-floor hallway, rather than the stairwell.

31.    Police Officer James Girdusky also responded to the scene where Sunada was found.

32.    Girdusky prepared a Complaint Report and another NYPD form.

33.    In both of these forms, Girdusky stated that Sunada was shot twice.

34.    In fact, Sunada had only been shot once.

35.     No fingerprint evidence was recovered from the stairwell or hallway.

36.     Police canvassed the Colombia building for leads on August 4 and 5, 1994, but developed none.

37.     Sunada passed away from his injuries on August 7, 1994.

38.     Sunada, a 22-year-old from Japan, had moved to the United States to pursue his dream of becoming a race car driver.

39.     This tragic event attracted significant media coverage, including articles in *The New York Times* on August 7 and 8, 1994.

40.     The killing was so prominent that then-mayor Rudolph Giuliani met with the victim's father in September 1994.

41.     Given that this was a high-profile incident, there was pressure upon the NYPD to "solve" the case.

## II.     Prior Robbery Allegations Against Cameron and McDonald

42.     Following the shooting of Sunada, police became aware that Plaintiff Cameron and another individual, Kendo McDonald, were suspected of committing robberies in Lefrak City.

43.     On November 20, 1993, an officer at the NYPD's 110th Precinct had charged Cameron and McDonald with committing a robbery in an elevator inside the Colombia building on November 19, 1993.

44.     On December 3, 1993, a detective at the NYPD's 110th Precinct had charged Cameron with committing a robbery inside the parking garage of another building in Lefrak City on November 12, 1993.

45.     The charges against Mr. Cameron stemming from the alleged November 19, 1993, robbery were dismissed on May 19, 1994.

46.     Mr. Cameron later was acquitted of the November 12, 1993, robbery.

47.     However, McDonald pled guilty and was sentenced to probation.

48.     The robbery allegations caused police to believe Cameron was involved in the robbery/murder of Sunada and to manufacture a case against him.

III.     **Police Fabricate a Statement by 16-year-old Lemuel Tuopaeh Naming Cameron and McCloud as the Perpetrators**

49.     On August 8, 1994, a then-16-year-old, Lemuel Tuopaeh, was arrested for an unrelated robbery in the NYPD's 110th Precinct.

50.     At this time, police lacked any evidence tying Cameron to the shooting of Sunada.

51.     Tuopaeh did not know anything about the Sunada shooting, but police pressured him to implicate Cameron and McCloud in the killing of "the Chinese guy" if he wanted to go home.

52.     Police officers, including but not limited to Defendant-Detectives Kempton and Wray and Defendant-P.O. Bove, coerced Tuopaeh into signing a statement they prepared, which he told them was false.

53.     The statement contained the false claim that he had overheard unnamed individuals say that Cameron, together with a friend, Armond McCloud, Jr., had committed the killing.

54.     Tuopaeh's statement was witnessed by Defendant Wray.

7

55.    Tuopaeh's statement was attached to a DD–5, prepared by Defendant Wray, which misleadingly omitted the manner in which police had coerced Tuopaeh.

56.    Despite being in custody for a robbery, Tuopaeh was released on his own recognizance at his arraignment.

57.    The charges related to his robbery arrest were later dismissed.

58.    By manufacturing Tuopaeh's false statement, police contrived a basis, also false, to take action against Mr. Cameron.

## IV.    Police Arrest Cameron, McCloud, and McDonald

59.    Later in the day on August 8, 1994, Defendant Gardnar, an NYPD sergeant and supervisor for the 110th Precinct Detective Squad, convened a meeting at which many NYPD detectives were present.

60.    Gardnar, referring to Tuopaeh, reported that a person arrested for a robbery earlier that day had given information implicating Cameron and McCloud in the shooting of Sunada.

61.    Meanwhile, also on August 8, 1994, Kendo McDonald was identified as having committed still another Lefrak City elevator robbery, this one on August 1, 1994.

62.    At about 7 p.m. on August 8, 1994, on the basis of the false hearsay in Tuopaeh's manufactured false statement, and without probable cause, police took Cameron and McCloud into custody.

63.    Detectives also took McDonald into custody.

64.    Cameron was stopped by officers including Defendants Croce and Dempsey.

65.     They handcuffed him.

66.     Cameron was standing with his father, Reginald Cameron, Sr., at the time he was approached by the officers.

67.     Cameron's father told the officers that Cameron was represented by an attorney, Elizabeth Pruser, and that he would notify her.

68.     Pruser, an attorney employed by the Legal Aid Society, was representing Cameron on his pending robbery case.

69.     Cameron was forcibly taken to the Lefrak City security office and placed in a holding cell.

70.     Defendants Croce and Dempsey then removed Cameron from the Lefrak City security office and took him to their vehicle.

71.     As Croce and Dempsey were doing so, Cameron's father approached them and again stated that Cameron was represented by an attorney.

72.     Cameron's father stated that he had tried to contact Cameron's attorney but couldn't get an answer, that he would continue to try, and that Cameron's attorney would be in contact with them.

73.     Cameron was subsequently transported to the NYPD's 110th Precinct.

74.     As of August 8, 1994, Cameron was 19 years old, McCloud was 20, and McDonald was 19.

75.     McCloud and McDonald also were transported to the 110th Precinct.

76.     In addition to Defendants Croce and Dempsey, Defendants Wray and Kempton were also involved in taking Cameron, McCloud, and McDonald into custody.

## V.  Cameron, McCloud, and McDonald are Coerced into Making False Statements

77.     Cameron, McCloud, and McDonald were separately interrogated by multiple detectives at the NYPD's 110th Precinct, including Defendants Herbert, Gonzalez, Greco, Kempton, Wray, Martinez, Croce, and Dempsey, beginning the evening of August 8, 1994, and continuing into the morning hours of August 9, 1994.

78.     Defendant Gardnar was present at the precinct and supervised these detectives.

79.     The interrogations, aggressive and coercive, were intended to turn them against each other.

### A.     Kendo McDonald's interrogation and statements

80.     Throughout numerous hours of questioning, McDonald denied knowledge of the shooting of Sunada.

81.     However, McDonald was then beaten to pressure him to implicate Cameron and McCloud.

82.     Mr. Cameron overheard this.

83.     Eventually, McDonald gave a signed statement implicating Cameron and McCloud in the shooting of Sunada.

84.     McDonald's statement claimed:

   a.     He saw Cameron and McCloud follow the victim into an elevator in the Colombia building;

   b.     After Cameron and McCloud came out of the back entrance to the building, McCloud said that he had shot the victim, and Cameron discarded a wallet; and

10

     c.     Three days later, Cameron admitted to McDonald that McCloud had shot the victim and that Cameron had taken the wallet.

85.     McDonald's false statement was signed by McDonald and witnessed by Defendants Herbert and Martinez.

86.     The time of the statement was noted as 1:45 a.m. on August 9, 1994.

87.     This was nearly seven hours after Cameron, McCloud, and McDonald had been taken into custody.

88.     Police knew or should have known that McDonald's statement was false:

     a.     McDonald recounted that he, Cameron, and McCloud were inside the Peru building of the Lefrak City complex when they spotted the victim by the elevator of the Colombia building, and that Cameron and McCloud then went to the Colombia building and followed him into the elevator. However, Cameron and McCloud could not have reached the victim in time without passing by the gateman of the Colombia building. The gateman had been interviewed by police and reported that he spoke to Sunada as he entered the vestibule, and that "other Oriental people" had entered the building, but made no reference to Cameron or McCloud, who are Black, following Sunada.

     b.     The statement claimed that Cameron and McCloud had followed the victim and "got on the elevator with him," but police had been told that Sunada liked to use the stairs to reach his 17th floor apartment, and Sunada had in fact been shot in the fourth floor stairwell.

     c.     McDonald claimed that, after the shooting, Cameron had thrown a wallet "as they were going down the hill," but police were unable to find it in the area McDonald directed them to.

     d.     McDonald reported that Cameron indicated that McCloud fired multiple shots at the victim, whereas in fact the evidence showed only one shot had been fired.

**B.      Plaintiff Cameron's interrogation and statements**

89.      At the precinct, Cameron stated that he wanted to speak with an attorney, thereby indicating that he was not comfortable speaking to the police alone and invoking his *Miranda* rights.

90.      However, police aggressively interrogated him anyway without any attorney present.

91.      During numerous interrogation sessions, the defendant-detectives employed physically coercive tactics, including painfully handcuffing him and physically striking him.

92.      The detectives also used psychological coercion, including, but not limited to, the following:

    a.      Questioning him despite his invocation of his *Miranda* rights;

    b.      Questioning him in an aggressive and intimidating manner;

    c.      Continuing the questioning for many hours while depriving him of sleep;

    d.      Refusing to accept his repeated denials of knowledge or involvement in the shooting;[1]

    e.      Showing him a plastic bag containing a wallet that purportedly was taken during the robbery and falsely telling him that his fingerprints were on the wallet;

    f.      Telling him, falsely, that bullets were found in McCloud's car;

    g.      Telling him that he had been implicated by McDonald and that he should implicate McCloud to obtain leniency for himself;

---

[1] Defendant Wray acknowledged, in his testimony at the subsequent suppression hearing, that after an initial interview of Cameron, he may have spoken to him as many as *ten* times.

h.   Offering him a false lifeline: that to obtain leniency, all he had to say was that he was present during the incident and witnessed McCloud shoot the deceased; and

i.   Suggesting "facts" to incorporate into his coerced story, including that the victim was followed into an elevator, a robbery of the victim was attempted, the victim was then killed in or near the elevator, and that the victim was shot at twice.

93.   Giving in to the detectives' coercion, Cameron made an oral statement falsely admitting that he accompanied McCloud in the elevator and witnessed McCloud shoot the deceased.

94.   At 3:13 a.m., approximately eight hours after he was taken into custody, Cameron signed a statement incorporating facts suggested to him by police.

95.   Defendant Gonzalez, among others, participated in obtaining Cameron's oral and written statements, and signed Cameron's written statement as a witness.

96.   Cameron subsequently made a videotaped statement to Assistant District Attorney Kim Marcus of the Queens County District Attorney's Office ("QCDAO").

97.   This occurred at the 110th Precinct, between 9:05 and 9:30 a.m. on the same date.

98.   Defendant Gonzalez was present during this interview to ensure that Cameron repeated the false account he had given earlier, which he did.

99.   The detectives knew or should have known that Cameron's videotaped statement was false:

a.   Cameron claimed the shooting occurred in the hallway, whereas it actually occurred in the stairwell, where Sunada's body was found by police;

13

b.     Cameron claimed to have observed two flashes, whereas forensic evidence showed only one shot had been fired;

c.     Cameron claimed to have seen the shooting but not heard it, even though he said he was standing about five or six feet away;

d.     Cameron denied seeing the gun, even though he claimed he saw two "flashes" from the shooting and that it occurred in the (presumably well-lit) hallway of a residential building;

e.     Cameron was unable to provide the time of the shooting, then claimed that it occurred as "it was just starting to get late," though police knew it occurred around 11:15 p.m.;

f.     Cameron said that Kendo McDonald was not with him and McCloud during the incident, and denied telling McDonald about the incident, in contradiction to McDonald's statement;

g.     Cameron's statement placed him and McCloud in the lobby of the Colombia building at the time they purportedly started to pursue the victim, whereas the gateman of the Colombia building hadn't mentioned seeing them in his interview with the police, and McDonald's account claimed that they began pursuing the victim upon spotting him from the Peru building;

h.     Cameron believed that the victim pressed the button for the 4th floor, though the victim lived on the 17th floor;

i.     Asked if the victim was carrying anything, Cameron claimed that he had a plastic bag, though the victim was in fact found with a blue knapsack;

j.     Though the victim's wallet was missing, Cameron denied seeing a wallet or having been told anything about a wallet by McCloud or McDonald; and

k.     Cameron was unable to provide any description of the victim, except claiming incorrectly he was "Chinese" (he was in fact Japanese).

**C.    Armond McCloud's interrogation and statements**

100.    The defendant-detectives also used coercion to elicit a false statement from McCloud implicating Cameron, including but not limited to the following:

a.   The detectives aggressively interrogated McCloud for hours, depriving him of sleep and refusing to accept his repeated denials of knowledge or involvement in the shooting;

b.   Defendant Gonzalez told McCloud, as Gonzalez later acknowledged at the suppression hearing, that others were making statements against him, and that if he did not make a statement, it would be their word against his;

c.   Gonzalez offered McCloud a way out, as he acknowledged at the suppression hearing and McCloud's trial, telling him that he knew "exactly what had happened" and that McCloud shot the decedent by accident;

d.   The detectives threatened McCloud that the victim's father had support from "Asian" gang members, who knew details about McCloud and McCloud's family and could harm them, and that he was better off staying in police custody; and

e.   A detective showed McCloud a wallet that purportedly was taken during the robbery and falsely told him that his fingerprints were on the wallet.

101.   In his testimony at McCloud's trial, Defendant Gonzalez expanded on the rationale behind his telling McCloud that he knew the incident was an accident, describing a conscious attempt at psychological manipulation:

> In the course of my investigations, I find that people don't talk unless they have a way out. It's like somebody being cornered.
>
> As long as they have something on the way to get out, which they believe, okay, everything was all right, they would talk. And sure enough it did occur that way.

102.   Giving in to the police coercion, McCloud made an oral statement, adopting details fed to him by police.

103.   These included, among other things, that the gun went off by accident, that the shooting occurred after the victim ran out of the elevator, and that Cameron was with him.

15

104.    McCloud then signed a written statement to the same effect.

105.    This statement bore the time 4:38 a.m., and was signed by Defendants Herbert and Gonzalez.

106.    McCloud subsequently made videotaped statements in an interview conducted by ADA Marcus at the 110th Precinct between 8:10 and 8:41 a.m. on August 9, 1994.

107.    Defendants Gonzalez and Herbert were present during this interview, to ensure that McCloud repeated the false account he had given earlier.

108.    On the videotape, McCloud claimed that he, Cameron, and McDonald went upstairs in an elevator with a "Chinese" man; that they were going to rob him; and that when the victim came out of the elevator, the victim kicked the gun in McCloud's hand, and the gun went off by accident.

109.    McCloud's videotaped statement contained "facts" contradicting those known to the police through their investigation, lacked details that would be known to someone who had actually perpetrated the crime, and was marked by other features indicating its falsity, including but not limited to the following:

    a.    McCloud claimed the shooting occurred in the hallway (as his written statement also seemed to indicate), tracking an error made in Defendant Gonzalez's DD-5's (*see* ¶¶ 25, 30), whereas it actually occurred in the stairwell, where Sunada's body was recovered by police;

    b.    McCloud claimed that McDonald was present during the shooting, in contradiction to McDonald's and Cameron's statements;

    c.    McCloud could not remember where he was coming from when he went to the Colombia building;

16

d.   McCloud could not remember what he was doing before he went into the Colombia building;

e.   McCloud could not explain why he went into the Colombia building;

f.   McCloud initially stated that he did not know whether the victim was holding anything, even though a knapsack was found right by Sunada's body by police, but then, prodded by ADA Marcus, incorrectly stated that the victim had a "grocery bag";

g.   Like Cameron, McCloud said the victim pressed the button for the fourth floor, though the victim lived on the 17th floor;

h.   McCloud claimed he was given the gun by Cameron during the incident, whereas Cameron claimed the gun was McCloud's;

i.   McCloud referred to the victim as "Chinese" even though he was Japanese;

j.   McCloud first said his finger was never on the trigger of the gun, then said that it was;

k.   McCloud initially said that he went to his friend's apartment after the shooting, but couldn't name the friend, and then said that he went "nowhere" and "just drove"; and

l.   McCloud couldn't remember where he drove to, or when he came back.

## VI.   Cameron and McCloud Are Charged and Indicted

110.   On August 9, 1994, Defendant Gonzalez, acting in concert with the other defendant-detectives, initiated the prosecution of Cameron and McCloud by signing a Criminal Court complaint falsely accusing them of murder in the second degree and other charges.

111.   At their arraignment, Cameron and McCloud were remanded without bail.

112.   Based on their false, coerced statements, Cameron and McCloud were indicted for murder in the second degree and other charges.

## VII.   Cameron's and McCloud's *Huntley*/*Dunaway* Motions are Denied

113.   Assistant District Attorney Jack Warsawsky of the QCDAO was assigned to handle the prosecutions of Cameron and McCloud for the homicide of Kei Sunada.

114.   The defendants moved to suppress their custodial statements.

115.   A *Huntley*/*Dunaway* hearing was held before the Honorable Steven W. Fisher, J.S.C., in the Supreme Court, Queens County, Criminal Term.

116.   In a decision rendered on October 2, 1995, the court found that Cameron and McCloud had been arrested without probable cause, but nonetheless denied suppression of Cameron's oral and written statements (and most of his videotaped statements), and McCloud's oral, written, and videotaped statements, on the basis of the false statement detectives had coerced from McDonald.

117.   Not knowing the manner in which police had coerced that statement, the court reasoned that McDonald's statement was an "intervening event" which justified the police in continuing to hold Cameron and McCloud for further interrogation.

## VIII.   McCloud is convicted at trial

118.   Following the denial of his and Cameron's suppression motions, McCloud proceeded to trial.

119.   The only evidence implicating McCloud at trial were his oral, written, and videotaped statements.

120.   On March 19, 1996, the jury found McCloud guilty of murder in the second degree and criminal possession of a weapon in the second degree.

121.    On April 15, 1996, McCloud was sentenced to 25 years to life in state prison.

## IX.    **Cameron pleads guilty**

122.    Cameron still faced trial on the same charges and a potential sentence of 25 years to life.

123.    However, prosecutors offered Cameron a deal he could hardly refuse: 3 ¾ to 11 ¼ years in prison on a reduced charge of robbery; the murder charge would be dismissed.

124.    Cameron already had served in jail nearly half the recommended minimum sentence.

125.    Knowing his statements, coerced from him, would be used against him at trial, and having seen the fate of his codefendant McCloud, he accepted the deal.

126.    Cameron then pled guilty to a crime he had not committed—robbery in the first degree—on May 14, 1996, and received the recommended sentence.

127.    Cameron remained in custody from the time of his arrest, on August 8, 1994, until he was released on September 3, 2003—after serving nine years and 26 days.

128.    Cameron was subsequently on parole for about two years and two months, his liberty constrained by highly restrictive and oppressive conditions.

## I.    **Post-Conviction**

129.    Upon Melinda Katz's assuming the position of District Attorney of Queens County in 2021, she formed a Conviction Integrity Unit ("CIU") within the QCDAO.

130.    The CIU conducted a reinvestigation of Cameron's and McCloud's cases.

19

131.    In the CIU proceedings, Cameron was represented by the Legal Aid Society's Wrongful Conviction Unit, and McCloud by the New Jersey Innocence Project at Rutgers University and the Center on Wrongful Convictions at the Northwestern Pritzker School of Law.

132.    The CIU reviewed files from two notorious Manhattan cases involving false confessions which Defendant Gonzalez had participated in prior to his handling of the Sunada robbery-homicide investigation.

133.    These cases were *People v. Santana, McCray, Salaam, Richardson & Wise* (the "Central Park 5" case) and *People v. Hincapie* (the Brian Watkins "Utah tourist" case).

134.    In 1989, Defendant Gonzalez had interrogated Antron McCray and Kevin Richardson, two of the Central Park 5, and obtained statements from them in which they implicated themselves in the rape of a jogger in Central Park.

135.    Subsequent DNA testing demonstrated the falsity of McCray's and Richardson's confessions and led to the reversal of their convictions in 2002.

136.    The CIU also became aware that in 1990, Defendant Gonzalez and another detective had obtained a statement from a suspect that falsely identified Johnny Hincapie in the stabbing of a Utah tourist, Brian Watkins, on the subway, and then coerced a false confession from Hincapie.

137.    Subsequent investigation showed that Hincapie was not involved in the stabbing and, like the Central Park 5, his conviction was vacated.

138.    The CIU consulted with a crime scene reconstruction expert, Kevin Parmelee, Ph.D., of the New Jersey Institute of Technology.

139.    Parmelee prepared a crime scene reconstruction demonstrating that both the shooter and Sunada were in the stairwell when Sunada was shot, in contradiction to the statements given by Cameron and McCloud that the shooting occurred in the fourth-floor hallway.

140.    By motions dated August 24, 2023, the QCDAO moved to vacate Cameron's and McCloud's convictions.

141.    In its motion to vacate Cameron's conviction, the QCDAO noted that "it is now recognized that the confession evidence elicited by Det. Gonzalez was unreliable."

142.    The QCDAO cited three factors: (1) "Det. Gonzalez has a proven track record of eliciting false confessions"; (2) "Cameron's confession contains indicia of unreliability and was obtained under similar circumstances as [] prior false confessions elicited by Det. Gonzalez"; and (3) "[c]orresponding errors in NYPD reports and Cameron's confession demonstrate a nexus between Det. Gonzalez's involvement and the unreliable content of the confession."

143.    For similar reasons, the QCDAO moved to vacate McCloud's conviction.

144.    More specifically, the QCDAO noted that errors in Cameron's and McCloud's statements corresponded to the police belief they had a modus operandi of robbing victims in elevators, to false information in police reports that appeared to have been fed to the two suspects, and to apparent guessing.

145.    The QCDAO pointed to the use by Det. Gonzalez and his colleagues of inherently coercive or suggestive interrogation techniques, including: (i) interrogations taking place overnight; (ii) prolonged interrogation; (iii) the use of "minimization"; and (iv) the use of "false evidence" ploys.

146.    The Honorable Michelle A. Johnson, J.S.C., granted the motions to vacate Cameron's and McCloud's convictions the same day they were filed.

### FIRST CAUSE OF ACTION
**Coercion Under 42 U.S.C. § 1983**
**Violation of the Fifth, Sixth, and Fourteenth Amendments**
**All Individual Defendants**

147.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

148.    The Individual Defendants, individually and in concert, used physical and psychological coercion to obtain involuntary statements from Cameron.

149.    These statements were introduced in the grand jury as the principal evidence supporting charges against Cameron and resulted in his indictment, subsequent prosecution, and conviction.

150.    The Individual Defendants are directly liable for their violation of Mr. Cameron's constitutional rights pursuant to 42 U.S.C. § 1983 and to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

151.    Alternatively, the Individual Defendants each had an affirmative duty to Mr. Cameron to protect his above-mentioned constitutional rights from infringement by other government officials.

22

152.    The Individual Defendants each knew that Plaintiff's constitutional rights would be violated if the Individuals Defendants' NYPD colleagues were to coerce statements from Plaintiff and those statements were used at a criminal proceeding.

153.    The Individual Defendants each had reasonable opportunities to intervene to prevent such infringement of Plaintiff's constitutional rights.

154.    Nevertheless, the Individual Defendants each deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

155.    As a result of the Individual Defendants' failure to intervene, Plaintiff was coerced into making statements, and those statements were used in the grand jury to indict him.

156.    In failing to intervene, the Individual Defendants each caused the violation of Plaintiff's right not to have a coerced statement used against him in the grand jury under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

157.    In failing to intervene, the Individual Defendants caused Plaintiff's resulting injuries.

158.    By virtue of the foregoing, under 42 U.S.C. § 1983, the Individual Defendants are liable to Plaintiff for all his consequential damages, including but not limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions, and all other consequential damages, and for punitive damages.

## SECOND CAUSE OF ACTION
### Evidence Fabrication Under 42 U.S.C. § 1983
### Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments
### All Individual Defendants

159.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

160.    The Individual Defendants, individually and in concert, knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to the truth, caused the manufacture or fabrication of false or patently unreliable statements and false or materially misleading documentary evidence implicating Mr. Cameron in the crime.

161.    The evidence they fabricated or manufactured includes but is not limited to: (i) Lemuel Tuopaeh's false written statement implicating Cameron; (ii) Plaintiff Cameron's false oral, written, and videotaped statements tending to implicate himself; (iii) Armond McCloud's false oral, written, and videotaped statements implicating Cameron; (iv) Kendo McDonald's false oral and written statements implicating Cameron; and (v) DD-5's pertaining to these statements that were false or misleading in that they omitted the police use of coercion to obtain such statements.

162.    The Individual Defendants manufactured false evidence for the purpose of causing criminal charges to be approved, and criminal proceedings to be initiated and continued, against Mr. Cameron.

163.    They forwarded or caused the forwarding of such false or manufactured material to prosecutors for use against Mr. Cameron.

164.    They knew that the evidence they forwarded to prosecutors would be likely to influence a jury's decision at trial.

165.    As a result of the Individual Defendants' aforementioned conduct, prosecutors initiated and continued a prosecution of Mr. Cameron and he was deprived of his liberty.

166.    The above misconduct by the Individual Defendants was outrageous and shocking to the conscience.

167.    The Individual Defendants' conduct violated Mr. Cameron's right to be free from unreasonable seizure as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, his Fifth and Fourteenth Amendment rights to procedural and substantive due process, and his Sixth and Fourteenth Amendment right to a fair trial.

168.    Alternatively, the Individual Defendants each had an affirmative duty to Mr. Cameron to protect his above-mentioned constitutional rights from infringement by other government officials.

169.    Each of the Individual Defendants knew that Mr. Cameron's constitutional rights would be violated if the conduct of the other government officials caused false, manufactured, fabricated or obviously unreliable evidence to be used against Mr. Cameron and to deprive him of his liberty.

170.    Each of the Individual Defendants had reasonable opportunities to intervene to prevent such infringement of Mr. Cameron's constitutional rights.

171.    Nevertheless, each of the Individual Defendants deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

172.    As a result of the Individual Defendants' failure to intervene, evidence was fabricated or manufactured against Plaintiff that would be likely to influence the decision at trial of a jury, was forwarded to prosecutors, and caused him to suffer the deprivation of his liberty.

173.    In failing to intervene, the Individual Defendants each caused the violation of Plaintiff's right to be free from unreasonable seizure as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, his Fifth and Fourteenth Amendment rights to procedural and substantive due process, and his Sixth and Fourteenth Amendment right to a fair trial.

174.    In failing to intervene, the Individual Defendants substantially caused Plaintiff's resulting injuries.

175.    By virtue of the foregoing, under 42 U.S.C. § 1983, the Individual Defendants are liable to Plaintiff for all his consequential damages, including but not limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions, and all other consequential damages, and for punitive damages.

### THIRD CAUSE OF ACTION
**Malicious Prosecution Under New York Law**
**All Defendants**

176.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

26

177.    The Individual Defendants, individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Mr. Cameron.

178.    They did so without probable cause.

179.    The proceedings terminated in Mr. Cameron's favor.

180.    By virtue of the foregoing, the Individual Defendants are liable to Plaintiff for all his consequential damages, including but not limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions, and all other consequential damages, and for punitive damages.

181.    Defendant City of New York is similarly liable under the principle of *respondeat superior*.

## FOURTH CAUSE OF ACTION
**Malicious Prosecution Under 42 U.S.C. § 1983**
**Violation of the Fourth, Fifth, and Fourteenth Amendments**
**All Individual Defendants**

182.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

183.    The Individual Defendants, by their foregoing conduct in initiating and continuing Plaintiff's criminal prosecution without probable cause, caused Plaintiff to be deprived of his liberty.

184.    In doing so, they are liable to him for their violation of his federal constitutional right to be free of unlawful detention and malicious prosecution pursuant to

42 U.S.C. § 1983 and to the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

185.    Alternatively, the Individual Defendants each had an affirmative duty to Mr. Cameron to protect his above-mentioned constitutional rights from infringement by other government officials.

186.    The Individual Defendants each knew that Plaintiff's constitutional rights would be violated if the Individuals Defendants' NYPD colleagues were to cause Plaintiff to be prosecuted without probable cause.

187.    The Individual Defendants each had reasonable opportunities to intervene to prevent such infringement of Plaintiff's constitutional rights.

188.    Nevertheless, the Individual Defendants each deliberately, willfully, recklessly, maliciously, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

189.    As a result of the Individual Defendants' failure to intervene, Plaintiff was prosecuted without probable cause and deprived of his liberty.

190.    In failing to intervene, the Individual Defendants each caused the violation of Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

191.    In failing to intervene, the Individual Defendants substantially caused Plaintiff's resulting injuries.

192.    By virtue of the foregoing, under 42 U.S.C. § 1983, the Individual Defendants are liable to Plaintiff for all his consequential damages, including but not

limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions, and all other consequential damages, and for punitive damages.

**FIFTH CAUSE OF ACTION**
**Violations of Rights Under New York City Administrative Code § 8-802**
**All Defendants**

193.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

194.    Pursuant to § 8-803 of the New York City Administrative Code, the Individual Defendants and their employer, the City of New York, are liable for their aforementioned violations of Mr. Cameron's rights, for his actual damages, and for punitive damages.

**SIXTH CAUSE OF ACTION**
***Monell* Liability for the Policies, Practices, and Customs of the New York Police Department Under 42 U.S.C. § 1983.**
**Defendant City of New York.**

195.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

196.    The foregoing violations of Mr. Cameron's federal constitutional rights and injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Cameron, who are investigated by NYPD detectives and subsequently prosecuted for alleged criminal offenses.

197.    Prior to Mr. Cameron's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of

29

criminal activity, to the risk of arresting, prosecuting, and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning: (a) the use of unduly coercive or suggestive interrogation techniques; and (b) the determination of probable cause to initiate a prosecution.

198.    With respect to "(a)" (coercive and suggestive interrogations), prior to Mr. Cameron's arrest and the initiation of his prosecution in 1994, the NYPD provided no training at all.[2]

199.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the NYPD Commissioner, who knew (or should have known):

---

[2] Counsel for the undersigned has deposed numerous police officers and detectives in other lawsuits concerning their training as of the mid-1990s. Such witnesses have testified that they received no training in the interrogation or evaluation of accomplice or "cooperating" witnesses in order to avoid unduly influencing their stories or testimony, determine their credibility, and assess whether their statements made out probable cause to arrest or prosecute.  These deposition transcripts are in the possession of Plaintiff's counsel and of the City of New York.  *See, e.g.*, Deposition of Det. Jose R. Hernandez, *Collins v. City of New York,* 11-cv-766 (FB), at p. 36 (cannot recall any training about how to evaluate witness credibility); Deposition of Internal Affairs Det. Kelly Wirth, *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DLP) (S.D.N.Y.), *supra,* at pp. 26-31 (possibly received a "couple hours" of general training about dealing with confidential informants, but recalls no training about how to evaluate the credibility of such witnesses); Deposition of then-Capt. Robert Boyce, *Zahrey, supra,* at pp. 35-36 (cannot recall any training about how to evaluate the credibility of cooperators or informants) (Boyce later became the NYPD's Chief of Detectives).

a.   to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b.   that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c.   that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

200.   The aforementioned policymaking officials had the knowledge and the

notice alleged in the preceding paragraphs based upon, among other circumstances:

a.   Credible allegations, many substantiated by judicial decisions finding, that NYPD detectives had manufactured false or unreliable evidence through improper suggestion, promises, or coercion, and/or knowingly given false or misleading testimony;

b.   civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified or exaggerated evidence, and/or conducted searches or made arrests without probable cause;

c.   numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, Federal District Courts, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the probable cause requirement of the Fourth Amendment;

d.   judicial decisions putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony;

e.   formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action;

     f.     the Mollen Commission Report, dated July 7, 1994, following a two-year investigation and a year of hearings, finding a "culture of corruption" in the NYPD, pervasive misconduct by NYPD officers and detectives including the fabrication of evidence and testimony, and tolerance of this culture and misconduct by the department's leaders; and

     g.     the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and their powerful incentives to close cases and to obtain arrests and convictions.

201.    Many of the aforementioned illegal practices, their toleration by police policymakers, and the culture of corruption that their indifference created, were documented, before the prosecution and conviction of Mr. Cameron, in the aforementioned Mollen Commission Report, formally known as the Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the NYC Police Department.

202.    The Mollen Commission was formed in 1992 after widespread reports of police corruption, including, among other things, the fabricating of evidence in criminal investigations.

203.    The Commission conducted an investigation and held highly publicized hearings over two years, leading to its issuance of its final report, prior to Mr. Cameron's arrest, on July 7, 1994.

204.    The Mollen Commission found that

> [o]fficers . . . commit falsification to serve what they perceive to be "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested. Officers reported a litany of manufactured tales. . . .

> Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands. And police falsification is the result.

Report at 38.

205.    The report noted: "Several officers . . . told us that the practice of police falsification . . . is so common in certain precincts that it has spawned its own word: 'testilying.'" *Id.* at 36.

206.    In one NYPD unit, the Commission found that "the unit's commanding officer not only tolerated, but encouraged, th[e] unlawful practice" of "falsif[ying] documents" and "committ[ing] testimonial perjury." *Id.* at 39.

207.    The Commission concluded that there existed

> … a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. . . . This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

*Id.* at 41.

208.    The Commission also noted that

> the Department's top commanders must share the blame. . . . We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch.
>
> Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. . . . Internal Affairs over the last decade had no record of the number of

falsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, *who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics*.

*Id.* at 41-42 (emphasis added).

209.    Consistent with the findings of the Mollen Commission, NYPD policymakers were aware, prior to Mr. Cameron's prosecution, that many detectives habitually violated proper police protocol regarding the investigation of homicides and other felonies, including the use of coercive or unduly suggestive interrogation techniques, and the preparation of false or misleading documentation.

210.    However, policymakers did little or nothing to prevent such misconduct, resulting in countless wrongful arrests, prosecutions, and convictions that were directly attributable to such policymakers' deliberate indifference.

211.    Two detectives whose repeated misconduct NYPD policymaking officials repeatedly turned a blind eye to were the notorious Louis Scarcella and Stephen Chmil.

212.    In 1988, in the murder prosecution of James Jenkins, Brooklyn Supreme Court Justice Francis X. Egitto, following a hearing, found that the "pretrial identification procedures employed by [Scarcella] were unduly suggestive and prejudicial to defendant."

213.    The decision detailed how Scarcella, in blatant violation of proper police practice and constitutional requirements, had shown a single photo of Jenkins to two

witnesses instead of a photo array in order to manufacture false and/or unreliable

"evidence."

214.   It also detailed how, upon Jenkins's arrest, Scarcella had brought five

witnesses to the precinct and conducted the following improper identification procedure:

> The witnesses were not separated prior to viewing defendant. Indeed,
> they were individually and collectively told by Detective Scarcella
> that "we arrested the man we believe was responsible for the death of
> the deceased; I would like you to take a look at him." After each
> witness individually viewed the defendant through a two-way mirror,
> that witness was returned to the room where his fellow witnesses
> waited. No effort was made to keep the witnesses from discussing
> their viewing of defendant who was observed, alone, in a room.

215.   The court concluded:

> The practices here utilized represent *a classic illustration of what not
> to do in conducting pretrial identification procedures*. It was
> unnecessary to display to the witnesses a single photo; no exigent
> circumstances justified a showup; and no argument can be advanced
> to support Detective Scarcella's telling the witnesses that the police
> had "arrested the man we believe was responsible for the death of the
> deceased." Based upon this *abysmal showing, and the Police's patent
> disregard for accepted identification procedures*, the court is left no
> choice but to exclude from trial all mention of such practices
> (emphasis added).

216.   Notwithstanding Justice Egitto's harsh criticism, the NYPD conducted no

investigation of, and took no disciplinary action against, Scarcella.

217.   Accordingly, Scarcella repeated his misconduct in 1990 in the David Ranta

case.

218.   Ranta was charged with murder in the high-profile shooting death of a

beloved Orthodox rabbi earlier that year.

219.     Scarcella and his frequent partner Chmil were assigned to investigate the killing.

220.     At a pretrial hearing, Scarcella testified that several months after the shooting, he spoke to a man named Alan Bloom, who had been arrested near the shooting location.

221.     Bloom was facing numerous robbery charges and many years in prison and was incarcerated at Rikers Island.

222.     Scarcella testified that Bloom had implicated men by the names of David and Steve but did not give last names.

223.     Scarcella testified that he then located photos of David Ranta and Steve Sicar, placed them in a photo array or photo arrays, and showed them to Bloom, who identified both men as having participated in the shooting.

224.     At the hearing, Justice Egitto expressed his incredulity:

> I'm still interested when a person gets arrested, when we have a police officer who tells us the name Steve comes up and he goes ahead to the Catch Unit and picks out a picture of Ranta and Steve when nobody told him Steve's last name. I don't know if he's a medium of some kind. He also picked out the name of Ranta before anyone told him Ranta's last name. From what I gather he heard the name David. Lo[] and behold they are the right people.
>
> It stretches the credulity of the court in how these pictures are obtained.

225.     Scarcella and Chmil manufactured a lineup identification of Ranta by blatantly suggesting to a witness whom he should pick.

226.   Justice Egitto again admonished Scarcella, and now Chmil too, on the record:

> The more I hear this the more I am disillusioned with the work of the detectives.
>
> Here a young man of 14, 15 years of age says specifically I *think* it is number three. The cop, probably Scarcella or Chmil, says, okay, number three. From there on in the kid goes along with the number three . . . .
>
> He said, I *think* it is number three, which is not identifying any one (emphasis added).

227.   This witness later revealed that a detective had told him to "pick the guy with the big nose."

228.   Justice Egitto made the following additional remarks about Scarcella's and Chmil's conduct during the Ranta investigation:

> I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package. . . .
>
> [T]hey decide the case and that is the reason why *a lot of our cases are being blown out* when the People only have the police officers to rely upon for their statements, such as narcotics cases and gun cases. *The detectives have to be taught here in New York State, unlike a lot of other places, we have a constitution.* And they have to live up to it. . . . I think it is ridiculous the way cops take it upon themselves to be judge, jury, and partial executioner. . . .
>
> I tell you this. In my opinion throughout this case the two detectives did all they could to tie it up in a neat package. . . . I don't think what they did and the manner in which they did it was, shall we say, absolutely fair (emphasis added).

229.   As a result of Scarcella's and Chmil's misconduct in manufacturing false or unreliable evidence, Ranta was convicted.

230.    Despite Justice Egitto's comments, the NYPD conducted no investigation of their misconduct and took no action to discipline them.

231.    As a result, Ranta remained in prison until the Kings County District Attorney's Office ("KCDAO") itself finally moved to vacate Ranta's conviction in 2013, after *The New York Times* exposed the misconduct of Scarcella and Chmil in the Ranta case and in obtaining numerous other wrongful convictions.

232.    It also was or should have been known to NYPD policymakers that in six different homicide prosecutions, Scarcella had used the false and inherently unbelievable "eyewitness" identifications of suspects by a single witness, Teresa Gomez, a drug addict.

233.    In these and numerous other cases investigated by Scarcella and Chmil, they pressured drug addicts to provide false evidence and used unlawful means to coerce or fabricate confessions and false identification evidence, causing numerous wrongful convictions that were not remedied until many years later.

234.    Scarcella was open about his attitude, saying: "Are there rules when it comes to homicide?  No. No, there are none. I lie to them. I will use deception. … I don't play by the rules."

235.    As one judge stated in overturning such a conviction:

> The findings of this court are that *the assigned Detective, Louis Scarcella, was at the time of the investigation [in 1991] engaged in false and misleading practices*. The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this *pattern and practice*. [This decision was issued before several more cases involving Scarcella were overturned.] The *pattern and practice of Scarcella's conduct*

38

> *which manifest a disregard for rules, law and the truth* undermines our judicial system and gives cause for a new review of the evidence.

*People v. Hargrove*, 49 Misc. 3d 1208(A), 2015 WL 6112660, at *8 (Sup. Ct. Kings Cnty. 2015) (emphasis added), *aff'd*, 162 A.D.3d 25 (2d Dep't 2018).

236.   Based on the above pervasive misconduct by Scarcella and Chmil, NYPD policymaking officials knew or should have known that the detectives were coercing confessions, manufacturing false or unreliable identification evidence, intentionally securing testimony that they knew to be false, and giving false testimony themselves.

237.   Yet these policymaking officials failed to supervise or discipline Scarcella or Chmil to ensure that such misconduct did not continue.

238.   Instead, the NYPD treated Scarcella and Chmil as heroes for obtaining arrests and convictions at a blistering rate, thus sending a clear message to the entire NYPD police force that such misconduct would be not just tolerated but celebrated.

239.   Another of the many homicide detectives who engaged in repeated misconduct to which NYPD policymakers were deliberately indifferent was Michael Race.

240.   Race admitted that he investigated 750 murder cases, through the late 1980s and early 1990s, but only one was "done the correct way, from A to Z."

241.   An NYPD colleague testified that Race

> had a reputation among detectives for feeding informants and witnesses details about crimes [and] that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks.

*Blake v. Race*, 487 F. Supp. 2d 187, 204 (E.D.N.Y. 2007).

242.    In 1990, Race caused both Jeffrey Blake and Ruben Ortega to be arrested and convicted on the word of a single informant produced by Race, Dana Garner.

243.    Race fed Garner the details that Garner then provided in testimony against the two men.

244.    At trial, Garner tried to recant his story, but after prosecutors threatened him, he retook the stand and testified against Blake.

245.    A cousin of Garner's testified that Garner had not been in New York at the time of the double murder.

246.    In 1998, the KCDAO conceded that Garner was an unreliable witness and consented to vacating Blake's conviction.

247.    In 1999, Garner signed a sworn statement recanting his accusations against Ortega and against another man, Timothy Crosby, whom Garner had previously accused of kidnapping him, resulting in Crosby's conviction and sentence of 10 years to life.

248.    That same year, a state judge vacated Crosby's conviction after finding Garner to be "a completely unreliable witness."

249.    In 2003, the Second Circuit vacated Ortega's conviction based on the unreliability of Garner's testimony.

250.    During civil litigation following the vacatur of Blake's conviction, Garner testified that Race had fed him the details that he repeated in his allegations and eventual testimony in the Blake and Ortega cases.

251.    Despite Race's pattern of unlawful activity and reputation for manufacturing false evidence, NYPD policymaking officials did not investigate, discipline, or supervise him to prevent additional misconduct.

252.    Another case that illustrates the pattern of misconduct to which NYPD policymaking officials were deliberately indifferent is that of Zaher Zahrey.

253.    From 1994 to 1996, various senior detectives from the NYPD's Internal Affairs Bureau ("IAB"), including supervisors, tried to frame Zahrey, a decorated NYPD undercover narcotics detective whom they wrongly suspected of being corrupt, for drug-related crimes including murder.

254.    The initially assigned detective, then-Sergeant Robert Boyce, tape-recorded himself encouraging a state prisoner whom he knew to be a serial robber and murderer and to be addicted to crack, Sidney Quick, to adopt a false story Boyce suggested to him implicating Zahrey in a series of murders, robberies, and drug deals.

255.    Boyce knew the story was false because it contradicted Quick's prior statements as well as independent police investigation.

256.    Boyce improperly promised Quick a "very, very, very sweet deal" and to "drive [Quick] home" if, contrary to his prior statements, he'd "nail Zack to a cross" by accusing Zahrey of being present for and participating in these crimes.

257.    Later, when other IAB detectives could not corroborate Quick's manufactured claims, they convinced the United States Attorney's Office in Brooklyn to take over the case by concealing Boyce's tape of Quick.

258.    While Quick was refusing to cooperate with the federal authorities, another assigned IAB detective, Kelly Wirth, worked with a prosecutor from the KCDAO, Teresa Corrigan, to use secret coercion and under-the-table promises to induce Quick into agreeing to testify.

259.    Zahrey ultimately was acquitted, but not until he had spent nearly nine months in jail on the manufactured charges.

260.    Zahrey also was acquitted by an NYPD administrative judge who found in a written decision that Boyce had led Quick to manufacture false allegations.

261.    The New York City Police Commissioner formally ratified this finding.

262.    Nevertheless, the NYPD continually promoted Boyce until he received the ultimate reward: appointment as Chief of Detectives for the entire department.

263.    None of the other IAB personnel involved in the Zahrey case were disciplined; instead, most were promoted.

264.    NYPD detectives also committed misconduct to obtain a corrupt murder conviction in 1995 in the Jabbar Collins case.

265.    Brooklyn detectives suspected Collins of having committed the botched robbery-murder of an Orthodox rabbi-landlord in 1994 in Williamsburg.

266.    The assigned detective, Vincent Gerecitano, a veteran homicide investigator, refused to accept the denial of a heroin addict, Edwin Oliva, who had just been arrested for an unrelated robbery committed in the same building, that he knew anything about the murder in question.

267.    Gerecitano detained Oliva for many hours and interrogated him while he was going through withdrawal and was drooling, crying, exhausted, and desperate.

268.    Gerecitano coerced Oliva into signing a sworn written statement implicating Collins by refusing to summon medical assistance for Oliva while simultaneously promising him that he would assist Oliva in obtaining leniency from the Brooklyn D.A.'s Office.

269.    Gerecitano omitted all these circumstances from his written report and never disclosed them to prosecutors.

270.    Later, before trial, Oliva recanted his coerced written statement, but prosecutors, evidently unaware of how Gerecitano had coerced Oliva's original sworn written statement, brought in Gerecitano to pressure Oliva to recant his recantation.

271.    Ultimately, in 2010, after Collins had spent 16 years in prison, prosecutors revealed the recantation, a federal judge ordered Collins's release, and all charges were dismissed.

272.    Until 2010, the NYPD had no policy, practice, or procedure to learn about and investigate allegations in lawsuits, settlements in lawsuits, or judicial findings of improper or illegal behavior by police officers, concerning investigations, arrests, and prosecutions.

273.    This was even though, since 1992, the NYPD had been admonished by two different New York City Comptrollers, as well as the Bar Association of the City of New York, to impose discipline on officers involved in settled civil cases in which

constitutional violations were alleged, and to institute new training in response to such claims, and/or other remedial action.

274.    In a 1992 report, then-Comptroller Elizabeth Holtzman recommended that the NYPD "monitor claims and lawsuits involving charges of police misconduct in addition to complaints filed with the Civilian Complaint Review Board and correlate the data from all three sources," and to "use the data from claims and lawsuits, as well as civilian complaints, to identify and correct problems in training or other procedures and policies; and identify individual police officers and take appropriate follow-up action, including additional training or other assistance" in order to "improve the functioning of the NYPD."

275.    In a 1999 report, then-Comptroller Alan Hevesi recommended that the City "[r]eview settled claims data," and re-train and discipline officers accordingly.

276.    In a 2000 report, The Association of the Bar of the City of New York concluded that the City's "policy" of failing to re-train or discipline officers involved in settled civil rights lawsuits "has resulted in a situation in which the City consistently misses opportunities to increase the protection of the rights of persons in the City."

277.    The NYPD took no official action in response to any of these reports and recommendations.

278.    In a report issued in 2010, then-Comptroller John Liu reported that, for the first time, the City paid out more money in the 2009-10 fiscal year for lawsuits against the NYPD than against any other City agency. He again recommended that the NYPD monitor incidents and practices that would give rise to claims.

279.   The NYPD failed to act despite its being put on notice, in the 1990's and early 2000's, to officers' misconduct by numerous civil lawsuits credibly alleging officers' violations of individuals' constitutional rights.

280.   In the following civil rights lawsuits, the City paid substantial monetary settlements to plaintiffs for their claims that NYPD officers manufactured evidence, gave false testimony or statements, initiated prosecutions without probable cause, or otherwise violated the constitutional rights of the accused:

a.   *Almonte v. City of New York, et al.*, 99-cv-519 (E.D.N.Y.) (settled 7/12/00, $30,000): plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court one year, eight months after arrest.

b.   *Boland v. City of New York, et al.*, 93-cv-5058 (E.D.N.Y.) (settled 8/6/96, $30,000): plaintiff arrested without probable cause; held in custody for two nights.

c.   *Bradley v. City of New York, et al.*, 97-cv-4076 (E.D.N.Y.) (settled 10/14/98, $20,000): plaintiff ordered to pull car over without probable cause; falsely arrested based on outstanding Illinois warrant issued for a different person; and held in custody for three days despite evidence that she was not the person being sought by the warrant.

d.   *Carthens v. City of New York, et al.*, 94-cv-8764 (S.D.N.Y.) (settled 3/18/97, $200,000): plaintiff arrested without probable cause; police fabricated that plaintiff had dropped a bag that contained cocaine and a weapon; police swore to a Criminal Court complaint with false allegations.

e.   *Castro v. City of New York, et al.*, 94-cv-5114 (S.D.N.Y.) (settled 1/14/97, $72,500): plaintiff arrested on weapons possession charges without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that NYPD officer responded to plaintiff's complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

f.   *Coleman, et al. v. City of New York, et al.*, 00-cv-2019 (E.D.N.Y.) (settled 1/2/01, $60,000): Two plaintiffs arrested without probable cause; charges

45

pending for 2 ½ months before dismissal. Complaint alleged that NYPD had policy, custom, and/or practice of arresting individuals without probable cause in lower income areas and areas with high reports of crime, which resulted in plaintiffs' false arrest and malicious prosecution.

g.   *Cotto v. City of New York, et al.*, 00-cv-1341 (E.D.N.Y.) (settled 12/01/00, $30,000): plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

h.   *Crespo v. City of New York, et al.*, 93-cv-8847 (S.D.N.Y.) (settled 8/29/06, $25,000): plaintiff arrested without probable cause on weapons possession charges. Complaint alleged *Monell* claim based on the NYPD's "fostering [of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

i.   *Dabbah v. City of New York, et al.*, 95-cv-2952 (S.D.N.Y.) (settled 3/12/96, $35,000): plaintiff arrested without probable cause; charges dismissed on People's motion eight months after arrest.

j.   *Daniels v. City of New York, et al.*, 00-cv-1981 (S.D.N.Y.) (settled 3/15/00, $28,500): plaintiff arrested without probable cause on weapons charges; charges dismissed by the court eight months after arrest.

k.   *Davis v. City of New York, et al.*, 00-cv-387 (S.D.N.Y.) (settled 1/19/00, $175,000): plaintiff arrested without probable cause; spent four months in jail before jury acquittal; during criminal trial, trial court found that plaintiff's arrest was "illegal and outrageous," that he was arrested solely because of his race, and that police took plaintiff's photo and showed it to the complainant unlawfully and without probable cause.

l.   *Deluise v. City of New York, et al.*, 98-cv-4535 (S.D.N.Y.) (settled 3/18/99, $28,000): plaintiff arrested without probable cause.

m.   *Denizard v. City of New York, et al.*, 98-cv-423 (E.D.N.Y.) (settled 6/4/99, $64,000): plaintiff arrested without probable cause for disorderly conduct, resisting arrest. Charges dismissed on People's motion eight months after arrest.

n.   *Dennis v. City of New York, et al.*, 98-cv-5355 (E.D.N.Y.) (settled 5/26/99, $15,000): plaintiff threatened, assaulted, and arrested without probable cause; false charges filed against plaintiff.

o.   *Espinal v. City of New York, et al.*, 95-cv-9759 (S.D.N.Y.) (settled 6/7/96, $800,000): plaintiff arrested without probable cause; police falsely testified before the grand jury; after plaintiff's guilty plea, conviction was vacated and the indictment was dismissed as procured by false and/or perjured testimony.

p.   *Fields v. City of New York, et al.*, 99-cv-8130 (E.D.N.Y.) (settled 7/28/00, $15,000): plaintiff arrested without probable cause; prosecution continued for four months before dismissal by court.

q.   *Frantino v. City of New York, et al.*, 96-cv-3725 (S.D.N.Y.) (settled 4/15/97, $50,000): Two plaintiffs arrested without probable cause and issued Desk Appearance Tickets; district attorney declined prosecution; parking summons issued by police dismissed for facial insufficiency.

r.   *Gager v. City of New York, et al.*, 97-cv-4718 (S.D.N.Y.) (settled 6/1/98, $105,000): plaintiff issued false summonses for criminal trespass and disorderly conduct; charges dismissed on People's motion.

s.   *Gallion v. City of New York, et al.*, 93-cv-5180 (S.D.N.Y.) (settled 7/18/94, $25,000): plaintiff arrested without probable cause; charges were dismissed.

t.   *Gallo v. City of New York, et al.*, 95-cv-2105 (E.D.N.Y.) (settled 7/5/94, $13,334): plaintiff arrested for robbery without probable cause; charges subsequently dismissed.

u.   *Gaylock, et al. v. City of New York, et al.*, 96-cv-6183 (E.D.N.Y.) (settled 3/6/98, $90,000): plaintiffs arrested without probable cause on weapons charges, which were pending for 10 months before dismissal by court.

v.   *Golston v. City of New York, et al.*, 98-cv-4206 (E.D.N.Y.) (settled 10/26/00, $25,000): plaintiff arrested on false charges of criminal harassment, which were dismissed after four months.

w.   *Gordon v. City of New York, et al.*, 97-cv-8035 (S.D.N.Y.) (settled 11/12/98, $40,000): plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by prosecutor three months after arrest.

x.   *Gurley v. City of New York, et al.*, 95-cv-2422 (E.D.N.Y.) (settled 8/21/97, $1,750,000): conviction obtained in 1972 was vacated more than 20 years later based on prosecutor's withholding of exculpatory evidence, including

an NYPD ballistics report. Complaint contained a malicious prosecution claim.

y.    *Howlen v. City of New York, et al.*, 97-cv-6544 (S.D.N.Y.) (settled 12/22/97, $200,000): plaintiff arrested without probable cause; police swore to false complaint; police testified falsely during preliminary hearing and in the grand jury; police admitted to committing perjury in connection with plaintiff's case.

z.    *Jefferson v. City of New York, et al.*, 98-cv-1097 (E.D.N.Y.) (settled 4/14/99, $175,000): plaintiff, a corrections officer, arrested on drug charges without probable cause; charges pending for 5 months before grand jury returned no true bill. Complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution.

aa.   *Kadlub v. City of New York, et al.*, 95-cv-1080 (E.D.N.Y.) (settled 12/11/96, $34,000): plaintiff arrested without probable cause on drug possession and sale charges.

bb.   *Lindo v. City of New York, et al.*, 98-cv-9066 (S.D.N.Y.) (settled 11/21/00, $85,000): plaintiff arrested without probable cause; police swore to false felony complaint; district attorney agreed to dismissal of charges.

cc.   *Lopez, et al., v. City of New York, et al.*, 93-cv-6516 (S.D.N.Y.) (settled 1/2/96, $80,000): two plaintiffs were arrested without probable cause and unlawfully strip searched; district attorney declined to prosecute.

dd.   *Lovell v. City of New York, et al.*, 00-cv-0002 (S.D.N.Y.) (settled 10/20/00, $40,000): plaintiff arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint.

ee.   *Mahase v. City of New York, et al.*, 96-cv-6105 (E.D.N.Y.) (settled 6/16/00, $75,000): plaintiff arrested and detained without probable cause; charges dismissed on district attorney's motion due to lack of probable cause.

ff.   *Marino v. City of New York, et al.*, 97-cv-9003 (S.D.N.Y.) (settled 6/4/98, $90,000): plaintiff arrested and strip-searched without probable cause; released when district attorney declined to prosecute case.

gg.   *Martinez v. City of New York, et al.*, 96-cv-289 (E.D.N.Y.) (settled 4/12/99, $50,000): plaintiff assaulted and arrested without probable cause when police entered her apartment with a battering ram looking for her son.

48

hh.   *McCaskill v. City of New York, et al.*, 96-cv-3687 (E.D.N.Y.) (settled 7/10/97, $100,000): plaintiff arrested for disorderly conduct without probable cause.

ii.   *Nakajima, et al. v. City of New York, et al.*, 94-cv-857 (E.D.N.Y.) (settled 3/8/95, $51,000): Two plaintiffs arrested without probable cause, while driving in rental car, despite providing a valid rental agreement.

jj.   *Napoli v. City of New York, et al.*, 97-cv-1255 (E.D.N.Y.) (settled 4/9/99, $60,000): Plaintiff arrested and indicted on weapons possession and assault charges based on false testimony by NYPD officers in grand jury. Plaintiff acquitted approximately one year after arrest.

kk.   *Nieves v. City of New York, et al.*, 94-cv-1491 (E.D.N.Y.) (settled 4/25/96, $50,000): Plaintiff, a security officer with the City's Department of Business Services with a Special Patrolman's license, was arrested without probable cause in baseless drug sweep, but never arraigned. Due to the incident, Plaintiff's employer revoked his license. An officer concocted a false story preventing Plaintiff from defending himself at a hearing pertaining to the revocation of his license.

ll.   *Paster v. City of New York, et al.*, 95-cv-10316 (S.D.N.Y.) (settled 3/23/98, $115,000): plaintiff arrested without probable cause; charges against him were dismissed.

mm.   *Perez v. City of New York, et al.*, 98-cv-2331 (S.D.NY.) (settled 1/16/99, $15,000): plaintiff arrested without probable cause; charges dismissed by court approximately one month after arrest.

nn.   *Rojas v. City of New York, et al.*, 96-cv-8728 (S.D.N.Y.) (settled 3/31/97, $800,000): plaintiff arrested without probable cause; police falsely charged plaintiff and testified falsely in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

oo.   *Sharp v. City of New York, et al.*, 97-cv-4236 (S.D.N.Y.) (settled 3/17/98, $55,000): plaintiff arrested and strip-searched without probable cause; falsely charged; charges were subsequently dismissed.

pp.   *Sierzputowski, et al. v. City of New York, et al.* (E.D.N.Y.) (settled 12/1/97, $55,000): two plaintiffs arrested without probable cause while driving a rental car, despite producing proof of valid rental; plaintiffs in custody for 41 hours until arrests voided.

49

qq.    *Silver v. City of New York et al.*, 97-cv-5384 (E.D.N.Y.) (settled 3/2/99, $40,000): plaintiff arrested without probable cause; charges were dropped approximately four months later.

rr.    *Sweazie v. City of New York, et al.*, 99-cv-419 (E.D.N.Y.) (settled 10/20/99, $20,000): plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint. Charges dismissed when grand jury voted no true bill.

ss.    *Taousse v. City of New York, et al.*, 95-cv-7965 (S.D.N.Y.) (settled 12/4/96, $16,000): plaintiff arrested without probable cause and falsely charged with violating traffic laws; charges were dismissed.

tt.    *Tomback v. City of New York, et al.*, 96-cv-3972 (E.D.N.Y.) (settled 2/9/98, $20,000): plaintiff arrested without probable cause; charges dismissed due to lack of evidence.

uu.    *Tong v. City of New York, et al.*, 95-cv-7965 (S.D.N.Y.) (settled 10/4/95, $35,000): plaintiff arrested and strip searched for traffic violation, which was later dismissed.

vv.    *Udofia v. City of New York, et al.*, 00-cv-4872 (E.D.N.Y.) (settled 1/4/01, $30,000): plaintiff arrested and detained without probable cause; was not prosecuted.

ww.    *Victor v. City of New York, et al.*, 96-cv-243 (S.D.N.Y.) (settled 6/17/96, $725,000): plaintiff arrested without probable cause; police falsely charged plaintiff and committed perjury in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

xx.    *Williams v. City of New York, et al.*, 98-cv-5917 (S.D.N.Y.) (settled 2/1/99, $300,000): plaintiff arrested without probable cause for possessing controlled substance; police falsified evidence to effect unlawful arrest of plaintiff.

yy.    *Ziehenni v. City of New York, et al.*, 98-cv-3763 (S.D.N.Y.) (settled 3/5/99, $55,000): plaintiff arrested without probable cause; charges pending for 2 ½ months before they were dismissed by the court. Complaint alleged arrest was made in retaliation for plaintiff's prior CCRB complaint.

281.    The NYPD did not discipline any of the officers involved for their conduct, despite paying out the above settlements.

282.    The aforementioned policies, customs and/or practices of the NYPD regarding, and policymakers' deliberate indifference to, coercion of false statements, fabrications of evidence, and initiation of arrests and prosecutions without probable cause, directly, foreseeably, proximately, and substantially caused the violations of Mr. Cameron's federal constitutional rights in this case and his resulting injuries.

283.    Under the principles of municipal liability for federal civil rights violations, the Police Commissioner (or his authorized delegates) had final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses and suspects and the initiation of criminal prosecutions.

284.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a policymaker for whom the City is liable, with respect to compliance by police employees with the above-mentioned constitutional requirements.

285.    During all times material to this Complaint, the Police Commissioners owed a duty to the public at large and to Mr. Cameron, which they knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, practices, training, and discipline sufficient to prevent or

deter conduct by their subordinates violating the constitutional rights of criminal suspects or defendants and of other members of the public.

286.    The aforesaid policies, procedures, regulations, practices and/or customs of the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Mr. Cameron's rights under the Constitution and laws of the United States.

287.    By virtue of the foregoing, under 42 U.S.C. § 1983, Defendant City of New York is liable for the misconduct of NYPD officers which caused Mr. Cameron's wrongful prosecution and conviction and all his consequential damages, including but not limited to his wrongful prosecution, conviction, subsequent imprisonment and parole restrictions, and all other consequential damages.

## **DEMAND FOR DAMAGES**

288.    Mr. Cameron's injuries and consequential damages include, but are not limited to:

a.    His wrongful prosecution and conviction;

b.    His loss of liberty for more than nine years, as a result of his arrest, prosecution, and conviction in the underlying case;

c.    His over two years spent under parole supervision, with his liberty constrained by highly restrictive conditions;

d.    The loss of the services, society, companionship, and consortium of his family and friends;

e.    Past mental and emotional harm and inadequate treatment therefor;

f.    Future mental and emotional suffering;

    g.      Physical injuries, including the permanent disfigurement of his face due to a brutal assault while incarcerated, and injuries sustained in numerous other assaults at the hands of inmates and corrections officers, and illness and inadequate treatment therefor; and

    h.      Lost employment income in an amount to be calculated by an economist.

WHEREFORE, Plaintiff Reginald Cameron, Jr. demands judgment against the Defendants as follows:

    a.      damages for lost income in an amount to be determined;

    b.      additional compensatory damages of not less than $27 million;

    c.      punitive damages against the Individual Defendants of not less than $10 million;

    d.      reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988, N.Y.C. Admin. Code § 8–805, and the inherent powers of this Court;

    e.      pre-judgment interest as allowed by law; and

    f.      such other and further relief as this Court may deem just and proper.

Yours, etc.,

/s/ Joel B. Rudin

JOEL B. RUDIN, Esq.
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

*Attorneys for Plaintiff*

Dated:     New York, New York
           June 26, 2024